# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Founders Bank,<br>    Plaintiff,<br><br>v.<br><br>CHICAGO TITLE INSURANCE COMPANY, CHICAGO TITLE AND TRUST COMPANY, and PROPERTY VALUATION SERVICES, LLC,<br>    Defendants. | No. 12-cv-05198<br><br>Judge Andrea R. Wood |

## MEMORANDUM OPINION

Plaintiff Federal Deposit Insurance Corporation ("FDIC"), acting as receiver for Founders Bank ("Founders"), has sued Defendants Chicago Title Insurance Company, Chicago Title and Trust Company (together with Chicago Title Insurance Company, the "Chicago Entities"), and Jo Jo Real Estate Enterprises, LLC d/b/a Property Valuation Services ("PVS," and together with the Chicago Entities, "Defendants") in connection with four real estate transactions that the FDIC characterizes as fraudulent "flip transactions." The Chicago Entities have filed a motion for summary judgment ("Motion") seeking to limit the FDIC's damages to the amount of the deficiency judgments that Founders obtained at the foreclosure sales of the properties at issue, and not the losses that the FDIC claims in its initial disclosures.

The Motion is granted in part and denied in part. If the FDIC establishes liability, the FDIC's recovery from the Chicago Entities will be limited to the sum of the deficiency judgments that Founders obtained at the foreclosure sales of the subject properties. Because the issue has not been briefed, the Court expresses no opinion on whether the FDIC will be limited in this manner as to any recovery against PVS. The Court also finds that the FDIC may not

recover attorneys' fees or court costs expended in this action, although it may recover such fees and costs incurred by Founders as a direct result of malfeasance by the Chicago Entities.

**BACKGROUND**

This case arises out of real estate transactions ("Subject Transactions") involving four properties ("Subject Properties") located in Chicago, Illinois: 2218-24 North Bissell ("Bissell Property"), 851 North LaSalle Street ("LaSalle Property"), 5408-10 North Campbell ("5408 Campbell Property"), and 5412-14 North Campbell ("5412 Campbell Property"). Founders acted as the lender/mortgagee for each of the Subject Transactions. In the present action, the FDIC alleges that the Chicago Entities acted negligently and breached contractual and fiduciary duties in their role as closing agent. The FDIC also seeks to establish the Chicago Entities' liability for negligent or fraudulent activities by their agents. In addition, the FDIC asserts causes of action for negligence and breach of contract against PVS, which acted as the appraiser in each of the Subject Transactions. For purposes of the Motion, the Court only considers the transactions involving the LaSalle Property, the 5408 Campbell Property, and the 5412 Campbell Property.[1] The following facts concerning those transactions are undisputed.[2]

In 2006, Founders extended loans for the purchase of the LaSalle Property, the 5408 Campbell Property, and the 5412 Campbell Property. (FDIC Stmt. of Add'l Facts ("SAF") ¶¶ 1, 12, 23, Dkt. No. 106.) The purchasers were three different limited liability corporations, all of which, the FDIC alleges, were formed by third-party defendant Douglas Shreffler. The Chicago Entities submitted the purported purchase price for each property to Founders, while PVS

---

[1] The FDIC does not appear to dispute the Motion with respect to the Bissell Property. (*See* FDIC Resp. at 2 n.2, Dkt. No. 104.)

[2] The FDIC did not dispute any of the Chicago Entities' undisputed facts (*see* FDIC's Resp. to Chicago Entities' Stmt. of Undisputed Mat. Facts ¶¶ 1-22, Dkt. No. 106), and the Chicago Entities failed to respond to any of the FDIC's additional material facts submitted pursuant to Local Rule 56.1(b)(3)(C), and thus each of those statements is deemed admitted. *See* N.D. Ill. L.R. 56.1(a).

appraised each of the properties on both an "as-is" and an "as-complete" basis. (*Id.* ¶¶ 2-3, 13-14, 24-25.) The appraisals, loan amounts, and stated purchase prices for the three properties are shown in Table 1.

**Table 1: Initial Transaction Values[3]**

| Subject Property | PVS Loan Appraisal (As-Is) | PVS Loan Appraisal (Completed) | Purchase Price, as Stated by Chicago Entities | Founders Loan Amount |
|---|---|---|---|---|
| LaSalle Property | $3,000,000 | $4,265,000 | $3,100,000 | $3,347,500 |
| 5408 Campbell Property | $1,165,000 | $1,885,000 | $1,165,000 | $1,459,373 |
| 5412 Campbell Property | $1,335,000 | $1,885,000 | $1,335,000 | $1,508,000 |

Each loan was secured by a mortgage on the respective property and, after the borrowers defaulted, Founders instituted legal actions seeking foreclosure. (*Id.* ¶¶ 4, 15, 26.) Founders obtained a Judgement of Foreclosure and Sale ("JOF") in state court for each of the properties. (Chicago Entities' Stmt. of Undisputed Mat. Facts ("SUF") ¶¶ 8-9, 14-15, 20-21, Dkt. No. 98.) The JOFs provided that the Subject Properties would be sold at a public sale upon the continued failure to satisfy all amounts due. (*Id.* ¶¶ 9, 15, 21.) Before the judicial sales went forward, Founders again engaged PVS to provide an appraisal of each property. (SAF ¶¶ 5, 16, 27, Dkt. No. 106.) Founders relied upon these appraisals when it bid and acquired each of the Subject Properties as the highest bidder at public auction via "credit bids." (*Id.* ¶¶ 6-7, 18-19, 28-29.) The sale of each Subject Property to Founders was approved by the state foreclosure court. (SUF

---

[3] The values in Table 1 are taken from the FDIC's Statement of Additional Facts. (SAF ¶¶ 1-3, 12-14, 23-25, Dkt. No. 106.).

¶¶ 12, 18, 22, Dkt. No. 98.) The foreclosure court also awarded deficiency judgments against the buyers. (*Id.* ¶¶ 12, 18, 22.) The values involved in the foreclosure sales are set forth in Table 2.

**Table 2: Foreclosure Sale Values[4]**

| Subject Property | Amount Due to Founders at Date of Sale | PVS Foreclosure Appraisal (As-Is) | PVS Foreclosure Appraisal (Completed) | Founders Credit Bid | Amount of Deficiency Judgment |
|---|---|---|---|---|---|
| LaSalle Property | $3,349,447.84 | $2,175,000 | Not specified | $1,990,000 | $1,359,447.84 |
| 5408 Campbell Property | $1,532,965.80 | $1,150,000 | $1,465,000 | $1,355,499.18 | $177,466.62 |
| 5412 Campbell Property | $1,532,965.80 | $1,150,000 | $1,465,000 | $1,437,399.22 | $188,176.94 |

On December 12, 2008, Founders Vice President Garry Corrie had a chance encounter with Ned Dikmen, a prior owner of the LaSalle Property. (SAF ¶ 8, Dkt. No. 106.) Over the course of the conversation, Corrie learned that Dikmen had sold the LaSalle Property for $2,400,000 on February 13, 2006. (*Id.*) The record does not reflect Corrie's reaction, but it seems certain Corrie was dismayed—after all, the Chicago Entities had led Founders to believe that the purchase price for the LaSalle Property was $3,100,000 and Founders loaned the buyer $3,347,500 to finance the purchase and construction. (*Id.* ¶¶ 1-2.) After this unwelcome discovery, Founders investigated the circumstances surrounding the LaSalle Property transaction and discovered that the Chicago Entities had performed two closings on February 13, 2006 for the LaSalle Property: one at the "true" sale price of $2,400,000 and another for the amount of

---

[4] The values in Table 2 are taken from the FDIC's Statement of Additional Facts and the Chicago Entities' Statement of Undisputed Material Facts. (SAF ¶¶ 5-6, 16-18, 27-28, Dkt. No. 106; SUF ¶¶ 11-12, 17-18, 21-22, Dkt. No. 98.)

$3,100,000 submitted to Founders by the Chicago Entities. (*Id.* ¶ 3.) Upon further investigation, Founders discovered that there had been two closings for each of the Subject Properties, with similar discrepancies between the actual purchase prices and the purchase prices submitted by the Chicago Entities. Furthermore, Founders discovered that the PVS "as-is" appraisals were significantly in excess of the purchase prices at the "true" closings. (*Id.* ¶¶ 20, 30.) The actual purchase prices, along with the stated purchase prices, the amounts Founders actually loaned, and PVS's "as-is" loan appraisals, are summarized in Table 3.

**Table 3: Sale Price Discrepancies[5]**

| Subject Property | PVS Loan Appraisal, As-Is | Loan Amount | Stated Purchase Price | Actual Purchase Price |
|---|---|---|---|---|
| LaSalle Property | $3,000,000 | $3,347,500 | $3,100,000 | $2,400,000 |
| 5408 Campbell Property | $1,165,000 | $1,459,373 | $1,165,000 | $845,000 |
| 5412 Campbell Property | $1,335,000 | $1,508,000 | $1,335,000 | $895,000 |

After learning about the double closings and having spent money on construction on the Subject Properties, Founders sold each of the properties at a loss. The FDIC, acting as receiver for Founders, then instituted the current lawsuit against the Chicago Entities and PVS. The total damages claimed by the FDIC—including the deficiency judgments Founders obtained during foreclosure proceedings, the losses sustained on the sale of the Subject Properties, and construction costs—are summarized in Table 4.

---

[5] The values in Table 3 are from the FDIC's Statement of Additional Material Facts. (SAF ¶¶ 1-3, 9, 12-14, 20, 23-25, 30, Dkt. No. 106.)

**Table 4: Losses Claimed by Founders[6]**

| Subject Property | Founders's Final Sale Price | Loss on Final Sale of Property | Deficiency Judgment | Construction Costs Post Sheriff's Sale | Founders's Total Claimed Damages |
|---|---|---|---|---|---|
| LaSalle Property | $1,350,000 | $640,000.00 | $1,359,447.84 | N/A | $1,999,447.84 |
| 5408 Campbell Property | $1,459,373 | $505,499.18 | $177,466.62 | $313,200.00 | $996,165.80 |
| 5412 Campbell Property | $1,508,000 | $587,399.22 | $188,176.94 | $313,200.00 | $1,088,776.16 |

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In seeking summary judgment, the moving party must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). The Court must consider the record as a whole and draw all reasonable inferences that favor the nonmoving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens*

---

[6] The values in Table 4 are taken from the FDIC's Statement of Additional Material Facts and the Chicago Entities' Statement of Undisputed Material Facts. (SAF ¶¶ 11, 21-22, 31-32, Dkt. No. 106; SUF ¶¶ 12, 18, 22, Dkt. No. 98; and Def.'s Aff. Ex. V at 16, Dkt. No. 100-4.)

*Transp. Co.*, 212 F.3d 969, 972 (7th Cir. 2000). A court may enter partial summary judgment with respect to a particular aspect of potential damages in a case, as the Chicago Entities seek here. *See, e.g., Pratt Cent. Park Ltd. P'ship v. Dames & Moore, Inc.*, 60 F.3d 350, 353 (7th Cir. 1995); *Edward E. Gillen Co. v. City of Lake Forest*, 3 F.3d 192, 193 (7th Cir. 1993).

## DISCUSSION

The Chicago Entities seek to limit the damages recoverable by the FDIC in this action to the sum of the deficiency judgments that Founders obtained at the foreclosure sales of the Subject Properties, and to dismiss the FDIC's demands for attorneys' fees and costs.

### I. Limitation of the FDIC's Damages

In its initial disclosures pursuant to Federal Rule of Civil Procedure 26(a), the FDIC states that Founders's total aggregate loss on the Subject Properties was $6,149,995.31. (Mot. Ex. V at 16, Dkt. No. 100-4.) These damages include deficiency judgments and purported losses on the final sales of the Subject Properties, as well as added construction costs for two of the four Subject Properties. The Chicago Entities argue that because Founders placed credit bids on the Subject Properties, the FDIC's damages should be limited to $3,880,696.91, *i.e.*, the sum of the deficiency judgments obtained by Founders at the foreclosure sales.

#### A. Illinois's Credit Bid Rule and *Freedom I*

The practice of "credit bidding" allows a foreclosing lender to bid on the property at auction. *Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, No. 03 C 6508, 2006 WL 695467, at *6 (N.D. Ill. Mar. 13, 2006) ("*Freedom I*"). As explained in *Freedom I*,

> [u]nlike any other bidder, the lender is not required to pay cash, but instead is entitled to make a credit bid up to the amount of its mortgage debt including allowable expenses. The foreclosing lender is allowed to credit bid in order to avoid the inefficiency of requiring the lender to tender cash which would only be immediately returned to it. A "full credit bid" is a bid in an amount equal to unpaid principal and interest of the mortgage debt. Most states, including Illinois,

7

hold that a lender is deemed to have received repayment of a loan in full if, at a foreclosure, it successfully bids the full amount of the loan (the "Full Credit Bid Rule").

*Id.* (internal quotations and citations omitted).

After a foreclosing lender's credit bid is approved by the court, a judgment can be entered for any remaining deficiency in repayment of the loan. "The deficiency judgment is based on an amount equal to the difference between the foreclosure sale price and the debt owed." *Id.* at *7. Under the Full Credit Bid Rule, where the property is obtained for a full credit bid, the underlying debt is deemed satisfied and the foreclosing lender is not entitled to either a deficiency judgment or related damages. *Id.* at *11 (citing *Partel, Inc. v. Harris Trust and Sav. Bank*, 437 N.E.2d 1225, 1227 (Ill. App. Ct. 1982)). Where the property is obtained by the foreclosing lender for a partial credit bid (*i.e.*, the credit bid is for an amount less than the full value of the loan) and there is no fraud or irregularity in the foreclosure proceeding, the amount of the lender's successful credit bid "is deemed to be the conclusive measure of the property's value for purposes of determining the value of any deficiency." *See Freedom I*, 2006 WL 695467, at *7 (quoting *Illini Fed. Sav. & Loan Assocs. v. Doering*, 516 N.E.2d 609, 612 (Ill. App. Ct. 1987)). In that circumstance, the lender is limited to recovering the sum of the deficiency judgment and collaterally estopped from claiming greater losses. *Id.* at *13-14.

Much of the parties' briefing of the Motion focuses on the import of *Freedom I*. That case addressed an issue of first impression under Illinois law: whether following a final order of foreclosure a lender can obtain damages for fraud in the inducement against borrowers and third parties in excess of the deficiency judgment set forth in the final order. *See id.* at *8. The plaintiff mortgage lender in *Freedom I* alleged that the buyer, broker, borrowers, and appraiser ("Freedom Defendants") engaged in fraud in connection with the purchase of nine real estate loans. *Id.* at

8

*2. After the borrower defaulted, the lender (via nominee) foreclosed upon the subject mortgages. *Id.* at *3. The properties were then sold at judicial auctions and the lender's nominee purchased all nine of the properties with credit bids. *Id.* The foreclosure court entered orders confirming the sale of the properties and also entered deficiency judgments for six of the nine; the other three had been purchased through full credit bids. *Id.* The lender then sued the Freedom Defendants for sums including the amounts of the deficiency judgments and the actual losses suffered by the lender when it sold the properties.

The Freedom Defendants moved for partial summary judgment, seeking to limit the plaintiff's damages to the amount of the deficiency judgments entered in state court. *Id.* at *5. The district court granted their motion. Relying heavily on the Second Circuit's decision in *Chrysler Capital Realty, Inc. v. Grella*, 942 F.2d 160 (2d Cir. 1991), as well as several California state appellate court decisions,[7] the *Freedom I* court found that "absent proof that a lender's credit bid was the proximate result of fraud, the [credit] bid stands" as a conclusive measure of the property's value "as against third parties (not, as Plaintiff contends, only against borrowers or junior creditors)." *Id.* at *11. The *Freedom I* court further found that this result comported with the intent of Illinois law with respect to credit bids, which is to ensure the finality of foreclosure sales and successful credit bids. *Id.* (collecting Illinois cases). It cited with approval the observation by the Second Circuit in *Chrysler Capital* that lenders could protect themselves from fraud by tendering an appropriate credit bid at the foreclosure sale. *Id.* at *9. Thus, the *Freedom I* court found that under the facts of that case, the lender was limited to recovering the sums of the deficiency judgments entered by the foreclosure court. *Id.* at *13. The court noted that, although the plaintiff-lender alleged that the defendant-appraiser had committed fraud in its appraisals, the

---

[7] Those cases include *Alliance Mortgage Co. v. Rothwell*, 900 P.2d 601 (Cal. 1995), and *Track Mortgage Group, Inc. v. Crusader Insurance Co.*, 120 Cal. Rptr. 2d 228 (Cal. Ct. App. 2002).

plaintiff had received new appraisals after the initial loan but before the lender placed its credit bids on the subject properties. *Id.* at *11. Accordingly, "[t]here simply ha[d] not been, nor could there be on the record before the Court, any allegations that the credit bids were proximately caused by any of the Defendants' fraudulent misrepresentations. In other words, Freedom knew the actual values of the Properties, and had the power to bid the way it wanted to protect its interests." *Id.*

The Seventh Circuit endorsed the *Freedom I* ruling in deciding a later appeal in the same case. On a subsequent summary judgment motion, the district court had held that the entire suit was barred by the claim preclusion and *Rooker-Feldman* doctrines. *See Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, No. 03 C 6508, 2008 WL 4866324 (N.D. Ill. July 11, 2008) ("*Freedom II*"). The Seventh Circuit reversed this decision. *See Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, 569 F.3d 667 (7th Cir. 2009) ("*Freedom III*"). In reversing *Freedom II*, the Seventh Circuit briefly commented on *Freedom I*'s conclusion that a lender "cannot recover damages from any third party by contending that the property was worth less than the amount of the credit bid." *Id.* at 670. The Seventh Circuit explained that "[a] lender's credit bid conclusively resolves the property's market value. Thus [a lender] could not lend $250,000, make a credit bid of $200,000, and still collect more than $50,000 on [a third party's] guaranty. [The] comprehensive opinion [in *Freedom I* ] covers that ground; we need not repeat its explanation." *Id.* at 671.

The Chicago Entities urge this Court to apply the rule articulated in *Freedom I* in the instant case. The Court agrees with that approach and finds that a credit bid generally stands as a conclusive measure of the property's value, even with respect to third parties. It is significant—if not dispositive—that the Seventh Circuit endorsed the relevant portion of *Freedom I*. Although the issue of the applicability of the credit bid rule to third parties was not squarely before the

Seventh Circuit, this Court is mindful of the "general rule" that "district courts should be guided by the views of the court of appeals . . . , even when those views are expressed in *dicta*." *See Reich v. Cont'l Cas. Co.*, 33 F.3d 754, 757 (7th Cir. 1994). The Court sees no reason to deviate from that general rule and will apply the rule articulated in *Freedom I* and endorsed by the Seventh Circuit in *Freedom III*.

The FDIC makes a number of arguments in an attempt to discredit the *Freedom I* opinion. None are persuasive. The FDIC first contends that *Freedom I* "plainly misconstrued" the Second Circuit's *Chrysler Capital* opinion, as that case only dealt with claims against the mortgagor and its owners, not third parties. (FDIC Resp. at 9-10, Dkt. No. 104.) While the FDIC accurately describes the actual holding of *Chrysler Capital*, it is not accurate to say that *Freedom I* "plainly misconstrued" that case. Rather, the *Freedom I* court cited *Chrysler Capital* as support for the principle that a lender-plaintiff's credit bid conclusively establishes the market value of the property notwithstanding allegations of fraud as to the underlying transaction. *Freedom I*, 2006 WL 695467, at *11.

The FDIC next argues that the *Freedom I* court's reliance on California state appellate court cases to support its decision "only show[ed] one side of the law on this issue, as other states have refused to extend the protection of the full credit bid rule to parties beyond borrowers." (FDIC Resp. at 9, Dkt. No. 104.) While that may be the case, all of the cases the FDIC cites in support of its position rely on the particular wording of the applicable state statutes.[8] There is no similar wording in the Illinois law that would limit the application of the Illinois credit bid rule only to recoveries against borrowers.

---

[8] *See Nat'l City Bank v. Lundgren*, 435 N.W.2d 588, 592 (Minn. Ct. App. 1989) (finding that guarantor was not protected by Minnesota's anti-deficiency statute based on the particular wording and legislative history of that statute); *Bank of Kirkwood Plaza v. Mueller,* 294 N.W.2d 640, 642-43 (N.D. 1980) (noting that plain language of North Dakota's anti-deficiency statute does not indicate that it protects guarantor);

11

The FDIC also contends that yet another decision in the *Freedom Mortgage* action establishes that the *Freedom I* rule does not apply to the tort damages being asserted in the instant case. On remand, after the Seventh Circuit's decision in *Freedom III*, the district court held that "[*Freedom I*] and the Seventh Circuit opinion make clear that [plaintiff lender] is limited by its partial credit bids with respect to contract damages but not tort damages, which may be pursued by [plaintiff lender] in connection with the six partial credit bid properties." *Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, 720 F. Supp. 2d 978, 1007-08 (N.D. Ill. 2010) ("*Freedom IV*"). The FDIC urges this Court to interpret this statement as authority that *Freedom I*'s interpretation of the partial credit bid rule does not limit damages in tort cases. (FDIC Resp. at 11, Dkt. No. 104.) The Court disagrees.

Reading the relevant passage in context makes clear that the district court was discussing the Seventh Circuit's ruling as to issue preclusion. The *Freedom IV* opinion established only that the plaintiff's successful mortgage foreclosure action barred further contractual claims under the Illinois transactional test of issue preclusion, but did not bar tort claims. *See Freedom IV*, 720 F. Supp. 2d at 1007-08. Indeed, *Freedom IV* ultimately reaffirmed the limitation of damages discussed in *Freedom I* and *Freedom III*, noting that "the value of the credit bids does not eliminate damages; there are deficiency judgments . . . , and the Defendants may ultimately be liable for those deficiency judgments and damages for related claims." *Id.* at 1007.

Finally, contrary to the FDIC's arguments, the *Freedom I* opinion is consonant with Illinois law. Specifically, Illinois law holds that "absent any fraud or irregularity in the foreclosure proceeding, the price at which the property is sold is deemed to be the conclusive

---

*First Sec. Bank of Idaho, N.A. v. Gaige*, 765 P.2d 683, 686 (Id. 1988) (Idaho anti-deficiency law does not apply to guarantor under plain language of statute).

measure of its value for purposes of setting a deficiency judgment." *Illini Fed. Sav. & Loan Ass'n.*, 516 N.E.2d at 611. The policy rationale for this rule is "to give stability and permanency to judicial sales" and "mere inadequacy of price is no reason for upsetting a judicial sale unless there are other irregularities." *Id.* Applying this rule to limit recovery against third parties fosters the underlying goals of the credit bid rule.

Moreover, applying the credit bid rule to limit recovery against third parties makes sound policy sense: absent proof of fraud or negligence that caused the lender to submit a credit bid that was too high, "[t]o allow the [lender], after effectively cutting off or discouraging lower bidders, to take the property—and then establish that it was worth less than the bid—encourages fraud, creates uncertainty as to the [borrower]'s rights, and most unfairly deprives the sale of whatever leaven comes from other bidders." *Freedom I*, 2006 WL 695467, at *9 (quoting *Chrysler Capital*, 942 F.2d at 163.) Absent malfeasance in relation to the credit bid transaction, this rule does not cause any undue prejudice to a lender, who can avoid all of these consequences by bidding what it believes the property is actually worth. *See id.* at *11. The FDIC raises no sound policy argument why application of the credit bid rule to recoveries against third parties is unfair, especially given the acknowledged exception when a credit bid is the product of a defendant's malfeasance.

Accordingly, the Court finds that the rule set out in *Freedom I* applies, absent some reason to believe that Founders was misled by Defendants in deciding how much to tender as a credit bid during the judicial sale.

B. **Applicability of *Freedom I* to the FDIC's Claims**

The FDIC next argues that, even if *Freedom I* does accurately state the law, its recovery here still should not be limited to the sum of the relevant deficiency judgments given the facts of

this case. For this argument, the FDIC primarily relies upon *SMFC Funding Corp. v. United Financial Mortgage Corp.*, 24 F. Supp. 2d 858, 862 (N.D. Ill. 1998). In that case, the plaintiff, a company engaged in the purchase and securitization of investment quality mortgage loans, purchased a mortgage loan from the defendant, a mortgage loan company. *Id.* at 859. Shortly thereafter, the loan went into default. *Id.* at 860. After foreclosing upon the property, the plaintiff purchased the property with a credit bid of $89,500, which was calculated based upon an untrustworthy appraisal value that defendant had provided. *Id.* at 862. Upon re-selling the property, however, the plaintiff received only $17,000. *Id.* The plaintiff eventually learned that the loan had been fraudulent from its inception and sued the defendant. *Id.* at 859. The district court granted summary judgment in favor of the plaintiff and found that the plaintiff's damages were not limited by the credit bid rule—in other words, the plaintiff could recover the $72,500 shortfall between the sale price of the foreclosed property and the amount of the plaintiff's credit bid. *Id.* at 863. The court reasoned that in submitting its credit bid, the plaintiff had relied upon the defendant's unreliable appraisal value; thus limiting damages to the amount of the deficiency would represent a "windfall" to the defendant. *Id.* at 862. This ruling is consistent with *Freedom I*, which recognized that a plaintiff can recover in excess of a deficiency judgment where its credit bid was proximately caused by a defendant's wrongdoing. *See Freedom I*, 2006 WL 695467, at *11.

The FDIC contends that the case currently before the Court is similar to *SMFC Funding* in that Founders was misled in its credit bids by faulty appraisals. According to the FDIC, "PVS's original appraisals were artificially inflated in order to support the larger purchase prices represented to Founders." (FDIC Resp. at 13-14, Dkt. No. 104.) The FDIC claims that these faulty appraisals were the basis for the second set of appraisals performed by PVS, which

14

Founders relied upon to calculate the amount of its credit bids in the judicial auction. The FDIC further attempts to implicate the Chicago Entities in PVS's allegedly infirm appraisals, arguing that "Founders had no reason to suspect wrongdoing by PVS (because the fraud had been concealed from Founders by the Chicago Entities and others) . . . ." (*Id.*) Thus, according to the FDIC, the Chicago Entities can be held accountable for losses that Founders suffered upon sale of the Subject Properties.

There are several problems with this argument, however. First, there are no allegations in the complaint to support the theory that the Chicago Entities somehow concealed wrongdoing by PVS, which in turn led to damages. The operative complaint alleges that the Chicago Entities breached their duties in a variety of ways, including by disbursing funds in violation of escrow instructions, by failing to provide accurate closing statements, by preparing and distributing closing statements that misrepresented the sales transactions, and by failing to supervise and train their employees and agents. But it does not contain a single factual allegation that the Chicago Entities had anything to do with either set of appraisals undertaken by PVS.

Perhaps more importantly for summary judgment purposes, the FDIC fails to adduce evidence that the Chicago Entities were in any way responsible for the losses that the FDIC claims were caused by PVS's second set of flawed appraisals. After briefing on this issue concluded, the FDIC submitted a supplemental brief and associated materials to support the argument that PVS used inaccurate property descriptions in completing both sets of appraisals, Founders relied upon the flawed appraisals in their post-default credit bids, and thus the partial credit rule should not limit the FDIC's recovery. (FDIC Sur-Reply at 7-8, Dkt. No. 143-1.) However, the FDIC does not cite any facts indicating that the Chicago Entities had any role in

the appraisal process, whether with respect to the original "flip" transaction or in the post-default appraisals.

Furthermore, the FDIC does not point to any facts indicating that the Chicago Entities helped to cover up the faulty nature of the appraisals. Because the FDIC has failed to produce any evidence from which a reasonable jury could find that the Chicago Entities were responsible for losses attributable to PVS's allegedly deficient post-default appraisals and Founders's subsequent credit bids, the Court grants partial summary judgment in favor of the Chicago Entities.[9] *See Freedom I*, 2006 WL 695467, at *11 (absent proof that a lender's credit bid was the proximate result of a defendant's fraud, the bid stands as against third parties). *See also Alliance Mortg. Co.*, 900 P.2d at 614 (Cal.1995) (credit bids limit damages against third parties unless plaintiff can show that its credit bids "were a proximate result of defendants' fraud, and that in the absence of such fraud it would not, in all reasonable probability, have made the [credit] bids"); *Track Mortg. Grp., Inc.*, 120 Cal. Rptr. 2d 228 (Cal. Ct. App. 2002), ("the lender's tort damages are . . . limited by the credit bid rule absent a showing that [defendant]'s conduct caused the lender to make the credit bid.").

PVS did not move for partial summary judgment seeking to limit damages recoverable against it; nor did it move to adopt the Chicago Entities' Motion. Accordingly, the Court expresses no opinion regarding whether the full credit bid rule bars recovery in excess of the deficiency judgments from PVS, as that issue is not before the Court.

C.  **Post-Sale Construction Costs**

---

[9] The FDIC contends that whether the Chicago Entities proximately caused damages in excess of the deficiency judgment is a matter for the jury to decide. However, one of the purposes of summary judgment is to dispose of factually unsupported claims. *See Celotex Corp.*, 477 U.S. at 323-24. The FDIC simply has not cited any evidence upon which a reasonable jury could rely to find that the Chicago Entities were complicit in PVS's second set of allegedly faulty appraisals. *See Anderson*, 477 U.S. at 248.

Notwithstanding the applicability of *Freedom I*, the FDIC seeks to recover costs incurred after the foreclosure bids, including $626,400 in construction costs incurred by Founders for the 5408 Campbell and 5412 Campbell Properties. Such a result would fly in the face of the rule articulated in *Freedom I* and endorsed in *Freedom III*. As discussed above, the FDIC did not plead that the Chicago Entities had any role in the provision of PVS's allegedly flawed appraisals and it has adduced no evidence that this was the case. Furthermore, it defies logic to argue that the Chicago Entities can be responsible for post-default construction costs when *Freedom I* essentially precludes liability in excess of deficiency judgments when there is no showing that the defendant wrongfully induced a credit bid. The FDIC conclusorily cites *Freedom III*, 569 F.3d at 672, on this point but does not elaborate how that case supports its position. Accordingly, the FDIC's argument is waived. *See Hess v. Kanoski & Assocs.*, 668 F.3d 446, 455 (7th Cir. 2012) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (internal quotation marks and citation omitted).

Accordingly, the Court grants the Motion to the extent it covers post-credit bid construction costs. Again, the Court expresses no opinion regarding whether the FDIC may recover these costs against PVS.

## II. The FDIC's Demands for Attorney's Fees and Litigation Expenses

The Chicago Entities ask the Court to strike the FDIC's demands for attorney's fees and litigation expenses. "The law in Illinois clearly is that absent a statute or a contractual agreement[,] attorney fees and the ordinary expenses and burdens of litigation are not allowable to the successful party." *Freedom IV*, 720 F. Supp. 2d at 989 (quoting *Kerns v. Engelke*, 390 N.E.2d 859, 865 (Ill. 1979)). The FDIC fails to point to any statute or contractual provision that would allow it to recover attorney's fees or litigation expenses that it expended in this action.

17

Accordingly, it is appropriate to strike such claims at the summary judgment stage. *See, e.g., Glessner v. Rybaski*, No. 09-CV-07917, 2013 WL 389006, at *5 n.13 (N.D. Ill. Jan. 31, 2013).

Under Illinois law, however, even though a plaintiff cannot recover attorney's fees expended in the action against the defendant, the plaintiff may recover attorney's fees expended in an effort to cure the damage caused by the defendant. *Duignan v. Lincoln Towers Ins. Agency, Inc.*, 667 N.E.2d 608, 613 (Ill. App. Ct. 1996). Accordingly, although the FDIC may not recover the attorney's fees it has expended in litigating this action, it may pursue attorney's fees and costs, if any, expended by Founders as a direct result of its attempts to cure any of the misdeeds the Chicago Entities are alleged in the complaint to have perpetrated.[10]

## CONCLUSION

For the foregoing reasons, the Chicago Entities' Motion (Dkt. No. 95) is granted in part. In seeking damages from the Chicago Entities, the FDIC will be limited to the amounts of the deficiency judgments that Founders obtained at the foreclosure sales of the Subject Properties. The Court further grants the Motion to the extent it seeks to strike the FDIC's claim for attorney's fees and costs expended in litigating the instant action; the FDIC may pursue damages in the form of attorney's fees and costs expended by Founders as a direct result of its attempts to cure any of the Chicago Entities' alleged misdeeds, however.

ENTERED:

Dated: September 9, 2015

_____
Andrea R. Wood
United States District Judge

---

[10] The Chicago Entities contend that the latter form of attorney's fees are considered "special damages" and must be pleaded with specificity pursuant to Federal Rule of Civil Procedure 9. (Chicago Entities Reply Br. at 14, Dkt. No. 113.) However, all of the cases cited by the Chicago Entities for that proposition pertain to the former sort of attorneys' fees—that is, those incurred litigating the instant action.