# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Founders Bank, | )<br>)<br>) |
| Plaintiff, | ) |
| | ) No. 12-cv-05198 |
| v. | ) |
| | ) Judge Andrea R. Wood |
| CHICAGO TITLE INSURANCE COMPANY, CHICAGO TITLE AND TRUST COMPANY, and PROPERTY VALUATION SERVICES, LLC, | )<br>)<br>)<br>) |
| | ) |
| Defendants. | ) |

## **MEMORANDUM OPINION AND ORDER**

This case concerns an escrow agent's alleged participation in a series of fraudulent "flip" real estate transactions. The flip transactions were designed to allow the purchasers of the properties, who had borrowed money from Founders Bank ("Founders"), to circumvent Founders's requirement that they make a down payment on the properties. Ultimately, these purchasers defaulted to the detriment of Founders. Consequently, Plaintiff Federal Deposit Insurance Corporation ("FDIC"), acting as receiver for Founders, sued Defendants Chicago Title Insurance Company and Chicago Title and Trust Company (together, "Chicago Title Entities"), for their conduct as the escrow agents for four such flip transactions. Specifically, the FDIC claims that Chicago Title Entities acted negligently and breached contractual and fiduciary duties in their role as closing agent. Now before the Court are the FDIC's motion for partial summary judgment on its breach of contract claim (Dkt. No. 207) and Chicago Title Entities' motion for summary judgment on the FDIC's breach of contract and negligence claims (Dkt. No. 218). The Court denies both motions in their entirety.

**BACKGROUND**

The real estate transactions at issue ("Subject Transactions") involved four properties ("Subject Properties") located in Chicago, Illinois: 2218-24 North Bissell ("Bissell Property"), 851 North LaSalle Street ("LaSalle Property"), 5408-10 North Campbell ("First Campbell Property"), and 5412-14 North Campbell ("Second Campbell Property"). Founders acted as the lender for each of the Subject Transactions. (Memo. Op. & Order at 2, Dkt. No. 183.)

The four transactions all followed a similar pattern. Founders extended a loan for the purchase of each Subject Property. (*Id.*) The purchaser for each was a different limited liability corporation. (Pl.'s Stmt. of Undisputed Mat. Facts ¶¶ 5, 20, 36, 52, Dkt. No. 208.) A condition for each of Founders's loans was that the purchaser would pay 20% of the purchase price. (*Id.* ¶¶ 6, 21, 37, 53.)[1] Founders then deposited with Chicago Title Entities approximately 80% of the stated purchase price, with the balance paid to Chicago Title Entities by the purchasers. (*Id.* ¶¶ 8, 23, 39, 55.) The loan amounts, stated purchase prices, and deposits made by Founders for the Subject Properties are shown below in Table 1.

---

[1] Chicago Title Entities argue that the 20% down payment condition has not been conclusively shown. (*See* Defs.' Resp. to FDIC's Stmt. of Mat. Facts ¶¶ 6, 21, 37, 53, Dkt. No. 237). As the Court's ruling does not rely on this fact, no finding need be made on this point.

**Table 1: Initial Deposit with Chicago Title Entities**[2]

| Subject Property | Purchaser | Purchase Price, as Stated by Chicago Title Entities | Founders's Loan Amount | Founders's Deposit | Purchaser Deposit |
|---|---|---|---|---|---|
| Bissell Property | 2218-2224 North Bissell, LLC | $3,250,000 | $3,435,332 | $2,636,665 | $650,000 |
| LaSalle Property | LaSalle and Chestnut, LLC | $3,100,000 | $3,347,500 | $2,514,050 | $620,000 |
| First Campbell Property | 5408-10 North Campbell LLC | $1,165,000 | $1,459,373 | $917,328 | $330,000 |
| Second Campbell Property | 5412-14 North Campbell LLC | $1,335,000 | $1,508,000 | $981,085 | $273,950 |

Chicago Title Entities then were to disburse the funds according to the escrow trust instructions provided by Founders for each transaction. Those escrow instructions, which were the same for all of the Subject Transactions, provided as follows:

> You [Chicago Title Entities] are then authorized and directed to proceed as follows:
>
> A. Prepare a RESPA (HUD-1) pursuant to financial information provided by Lender [Founders] and Seller, if a sale transaction . . . .
>
> B. Obtain Lender [Founders's] approval of any Mortgagor "Credits" above nominal or customary amount.
>
> C. Pay net sale proceeds to Seller if a sale transaction, pursuant to Buyer/Seller escrow instructions.
>
> D. Deliver [subsequently listed documents] to the Lender [Founders] . . . .

---

[2] The values in Table 1 are taken from Plaintiff's Statement of Undisputed Material Facts ¶¶ 5, 7, 15, 20, 22, 31, 36, 38, 47, 52, 54, 63, Dkt. No. 208.

(Exs. 10, 24, 34, 43 to Pl.'s Stmt. of Undisputed Mat. Facts, Dkt. Nos. 208-8, 208-18, 208-23, 208-29.) In each transaction, Chicago Title Entities disbursed a significant portion of the deposited funds to other entities that the FDIC claims were closely related to the purchasers. Then Chicago Title Entities transferred funds roughly corresponding to Founders's deposits into a separate escrow trust; those funds were then used to close on the Subject Properties with the actual sellers.

In essence, the alleged scheme was designed to allow the purchasers to obtain the property with no down payment and with Founders's loan proceeds paying for the entire purchase. The purchasers would inflate the stated purchase price of the property to the point that Founders's 80% deposit would cover the actual purchase price of the property. The purchaser would front 20% of the stated purchase price to Chicago Title Entities, but Chicago Title Entities would distribute that amount back to the purchaser through entities that were closely related to the purchaser. Details for each transaction follow.

### **Bissell Property**

Chicago Title Entities received a total of $3,286,665 from Founders and 2218-2224 North Bissell, LLC. (Pl.'s Stmt. of Undisputed Mat. Facts ¶¶ 8, 12, Dkt. No. 208.) 2218-2224 North Bissell, LLC received credits and repayments totaling $125,130. (*Id.* ¶ 12.) Chicago Title Entities' disbursement statement said that they paid $583,506 to Sarmisegeturza Investments, L.L.C., but Chicago Title Entities actually made that payment to 7000 South Chappel, LLC. (*Id.* ¶ 13.) The manager of 7000 South Chappel, LLC was Gheorge Pop, who was also a member of the purchaser 2218-2224 North Bissell, LLC. (*Id.*) Pop also received a separate disbursement of $20,000 from Chicago Title Entities. (*Id.*) Finally, Chicago Title Entities transferred $2,588,436

4

to another escrow trust. (*Id*. ¶ 14.) That second escrow trust was used in a second transaction with the actual sellers of the property, where the purchase price was $2,600,000. (*Id*. ¶ 15.)

**LaSalle Property**

Chicago Title Entities received a total of $3,134,050 from Founders and LaSalle and Chestnut, LLC. (*Id*. ¶¶ 23, 27.) LaSalle and Chestnut, LLC received credits and repayments totaling $75,307. (*Id.*) Chicago Title Entities' disbursement statement stated that they paid $689,675 to North Star Deferred Exchange, but Chicago Title Entities actually made that payment to the aforementioned 7000 South Chappel, LLC, whose manager Gheorge Pop was also a member of the purchaser LaSalle and Chestnut, LLC. (*Id.*) Chicago Title Entities transferred $2,353,551 to another escrow trust. (*Id*. ¶ 30.) That second escrow trust was used in a second transaction with the actual sellers of the property, where the purchase price was $2,400,000. (*Id*. ¶ 31.)

**First Campbell Property**

Chicago Title Entities received a total of $1,247,328 from Founders and 5408-10 North Campbell, LLC. (*Id.* ¶¶ 38, 43.) 5408-10 North Campbell, LLC received credits and repayments totaling $110,336. (*Id.*) Chicago Title Entities' disbursement statement said that they paid $318,215 to Frank R. Palm. (*Id.* ¶ 44.) In fact, Chicago Title Entities disbursed payments in this sum to John DeHelean, who was the sole member of the purchaser, as well as Gheorge Pop, Stefan Piuian, and Petru Laba. (*Id.* ¶ 45.) Chicago Title Entities transferred $818,455 to another escrow trust. (*Id.* ¶ 44.) That second escrow trust was used in a second transaction with the actual sellers of the property, where the purchase price was $845,000. (*Id.* ¶ 46.)

**Second Campbell Property**

Chicago Title Entities received a total of $1,219,035 from Founders, 5412-14 North Campbell, LLC, John DeHelean, and other deposits. (*Id.* ¶¶ 55, 59.) 5412-14 North Campbell, LLC received credits and repayments totaling $127,127. (*Id.* ¶ 59.) Chicago Title Entities' disbursement statement said that they paid $337,002 to Frank R. Palm. (*Id.* ¶ 60.) In fact, Chicago Title Entities disbursed payments in this sum to 5222 South Drexel, LLC and Stefan Piuian. 5222 South Drexel, LLC, was managed by John DeHelean, who was also the sole member of the purchaser 5412-14 North Campbell, LLC. (*Id.* ¶ 61.) Chicago Title Entities transferred $869,388 to another escrow trust. (*Id.* ¶ 60.) That second escrow trust was used in a second transaction with the actual sellers of the property, where the purchase price was $895,000. (*Id.* ¶ 62.)

\*    \*    \*

Founders's deposits towards the sale, the purchasers' deposits toward the sale, the stated purchase prices, and the actual purchase prices are summarized below in Table 2.

Table 2: Sale Price Discrepancies[3]

| Subject Property | Founders's Deposit | Purchaser Deposit | Stated Purchase Price | Actual Purchase Price |
|---|---|---|---|---|
| Bissell Property | $2,636,665 | $650,000 | $3,250,000 | $2,600,000 |
| LaSalle Property | $2,514,050 | $620,000 | $3,100,000 | $2,400,000 |
| First Campbell Property | $917,328 | $330,000 | $1,165,000 | $845,000 |
| Second Campbell Property | $981,085 | $273,950 | $1,335,000 | $895,000 |

Ultimately, the purchasers all defaulted on the loans. Founders then instituted legal actions seeking foreclosure. Founders obtained a Judgement of Foreclosure and Sale ("JOF") in state court for each of the Subject Properties. The JOFs provided that the Subject Properties would be sold at a public sale upon the continued failure to satisfy all amounts due. Founders acquired each of the Subject Properties as the highest bidder at public auction via "credit bids." The sale of each Subject Property to Founders was approved by the state foreclosure court. The foreclosure court also awarded deficiency judgments against the buyers. (Memo. Op. & Order at 3–4, Dkt. No. 183.) The values involved in the foreclosure sales are set forth below in Table 3.

---

[3] The values in Table 2 are taken from Plaintiff's Statement of Undisputed Material Facts ¶¶ 5, 7, 15, 20, 22, 31, 36, 38, 47, 52, 54, 63, Dkt. No. 208.

**Table 3: Foreclosure Sale Values**[4]

| Subject Property | Amount Due to Founders at Date of Sale | Founders's Credit Bid | Amount of Deficiency Judgment |
|---|---|---|---|
| Bissell Property | $3,692,938 | $1,560,000 | $2,155,606 |
| LaSalle Property | $3,349,448 | $1,990,000 | $1,359,448 |
| First Campbell Property | $1,532,966 | $1,355,499 | $177,467 |
| Second Campbell Property | $1,602,500 | $1,437,399 | $188,177 |

After learning about the double closings and having spent money on construction on the Subject Properties, Founders sold each of the properties at a loss. The FDIC, acting as receiver for Founders, then instituted the current lawsuit. (Memo. Op. & Order at 5, Dkt. No. 183.)

## DISCUSSION

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In seeking summary judgment, the moving party must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving

---

[4] The values in Table 3 are taken from this Court's prior Memorandum Opinion & Order at 4, Dkt. No. 183.

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). The Court must consider the record as a whole and draw all reasonable inferences that favor the nonmoving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transp. Co.*, 212 F.3d 969, 972 (7th Cir. 2000). Courts may consider motions for partial summary judgment as to particular issues or facts in a case, even if those issues are not in and of themselves dispositive of a claim or case. *See, e.g.*, *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 513 (7th Cir. 2014); *Gipson v. United States*, 631 F.3d 448, 452 (7th Cir. 2011). Of course, when considering cross-motions for summary judgment, the same standard applies to each motion. *Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002).

## I. The FDIC's Motion for Partial Summary Judgment

The FDIC moves for summary judgment only on its breach of contract claims. The FDIC contends that, in each of the four Subject Transactions, Chicago Title Entities violated the escrow trust instructions that they were contractually obligated to follow. Specifically, the FDIC contends that Chicago Title Entities violated the instructions by: (1) submitting escrow trust disbursement statements that failed to accurately reflect the credits and disbursements made at closings; (2) making substantial disbursements to the borrowers without approval; and (3) not paying the net sale proceeds to the sellers pursuant to written Buyer/Seller escrow trust instructions. All of these claims ultimately stem from the FDIC's allegation that Chicago Title Entities wrongly disbursed funds to entities without approval.

Recall the basic structure of the Subject Transactions. Founders provided Chicago Title Entities with approximately 80% of the *stated* purchase price of the Subject Properties, while the respective purchasers deposited with Chicago Title Entities the remaining 20% of the *stated*

9

purchase price. Chicago Title Entities then transferred most of the moneys put up by Founders into a separate, second escrow trust account, which would be used in a second transaction to purchase the property. The funds paid by the purchasers would be paid to other entities and individuals—that allegedly had some relationship with each of the purchasers. The FDIC argues that Chicago Title Entities' disbursements of funds to entities and individuals other than the sellers violated the escrow trust instruction that Chicago Title Entities "[p]ay net sale proceeds to Seller if a sale transaction." (Exs. 10, 24, 34, 43 to Pl.'s Stmt. of Undisputed Mat. Facts, Dkt. Nos. 208-8, 208-18, 208-23, 208-29.) Moreover, according to the FDIC, Founders did not approve these payments to the other entities and individuals—which were actually stand-ins for the purchaser—and so the disbursements back to the purchaser were unapproved credits "above [a] nominal or customary amount." (*Id.*) Finally, the FDIC contends that Chicago Title Entities' disbursement statements did not accurately reflect the disbursements to other entities and individuals, thereby concealing that the stated purchase price of these transactions was a ruse.

Chicago Title Entities respond that they simply followed the escrow trust instructions as written. The escrow trust instructions directed Chicago Title Entities to pay the Seller "pursuant to Buyer/Seller escrow instructions." (Exs. 10, 24, 34, 43 to Pl.'s Stmt. of Undisputed Mat. Facts, Dkt. Nos. 208-8, 208-18, 208-23, 208-29.) Chicago Title Entities contend that for each transaction, they were directed by the buyer and seller to pay the other entities part of the sale proceeds and to segregate part of the sale proceeds into a separate escrow trust. If Chicago Title Entities followed the instructions of the buyers and sellers in their disbursements to the other entities and individuals, then Chicago Title Entities did not violate condition (C) of the escrow trust instructions. And if these disbursements were made pursuant to the Buyer/Seller escrow instructions, then they were made with approval, were not unapproved "Mortgagor Credits," and

10

did not violate condition (B). Consequently, under Chicago Title Entities' view, their disbursement statements accurately reflected the credits and disbursements that the escrow trust instructions allowed them to make and thus they did not violate condition (A) of those instructions. Put another way, assuming that Chicago Title Entities did make disbursements according to Buyer/Seller escrow instructions, Chicago Title Entities simply paid a third party at the direction of the seller. As a seller is allowed to spend its proceeds wherever it likes, Chicago Title Entities' payments were proper and approved, and their disbursement statements accurate.

Thus, the critical question is whether Chicago Title Entities' disbursements to these other individuals and entities were made pursuant to Buyer/Seller escrow instructions. This is a question of fact and both sides have presented evidence bringing its resolution into contention. Chicago Title Entities have presented some documentary evidence that their disbursements were directed by the buyer and seller. (*See* Defs.' Resp. to FDIC's Stmt. of Mat. Facts ¶¶ 13, 15–16, Dkt. No. 237 (citing a document stating that the disbursements with respect to Bissell transaction were made "AS DIRECTED," potentially indicating that they were directed by buyer and seller); *id.* ¶ 29 (similar for LaSalle transaction); *id.* ¶¶ 45, 61 (similar for both North Campbell transactions); Decl. of Nancy Castro ¶ 7, Dkt. No. 237-3 at 15 (stating that these documents showed that payments were directed by buyer and seller).) Meanwhile, the FDIC has pointed to evidence in the record supporting an inference that those funds were not disbursed to the other entities pursuant to any such Buyer/Seller escrow instructions. For example, Chicago Title Entities Escrow Manager Nancy Castro testified that she was not aware of any written Buyer/Seller escrow instructions for these four transactions, (Pl.'s Stmt. of Undisputed Mat. Facts ¶¶ 13, 29, 45, 61, Dkt. No. 208), and the employees at Chicago Title Entities who made the

payments to the other entities testified that they were not sure who authorized the payments, (*id.*).

Neither side has brought to the Court's attention any evidence on whether the sellers of the Subject Properties were aware of the disbursements to the other parties and individuals. On this record, there is a genuine issue of material fact as to whether Chicago Title Entities properly disbursed the funds pursuant to "Buyer/Seller escrow instructions," and consequently whether Chicago Title Entities violated the escrow trust instructions. Thus, the Court denies the FDIC's motion for partial summary judgment on its breach of contract claims.

## II.     Chicago Title Entities' Motion for Partial Summary Judgment[5]

Chicago Title Entities move for partial summary judgment on the FDIC's breach of contract and negligence claims. With respect to the breach of contract claim, Chicago Title Entities claim that the FDIC cannot show that the alleged breach proximately caused the loss. On the negligence claim, Chicago Title Entities argue that the economic loss doctrine bars recovery. The Court rejects both arguments and therefore denies Chicago Title Entities' motion.

### A.     Breach of Contract Claim

Under Illinois law, a plaintiff asserting a breach of contract claim must show that the claimed damages were proximately caused by the purported breach. *Chamberlain Mfg. Corp. v. Maremont Corp.*, 1993 WL 535420, at *3 (N.D. Ill. Dec. 19, 1993) (citing *Vill. of Sherman v. Vill. of Williamsville*, 435 N.E.2d 548, 553 (Ill. App. Ct. 1982)). "Proximate cause is composed of two elements: legal cause and cause in fact [or but-for cause]. Legal cause exists where the injury was of a type that a reasonable person would foresee as a likely result of his or her conduct." *Cleveland v. Rotman*, 297 F.3d 569, 573 (7th Cir. 2002) (citing *Kleen v. Homak Mfg.*

---

[5] Chicago Title Entities also purport to move for judgment on the pleadings on the FDIC's claims. But Chicago Title Entities merely cite the applicable legal standard without further argument. (Defs.' Mot. for Summ. J. at 19, Dkt. No. 218.) The Court thus denies Chicago Title Entities' motion on that ground.

*Co.*, 749 N.E.2d 26, 29 (Ill. App. Ct. 2001)). In this case, Chicago Title Entities contend that the FDIC cannot show that the alleged breach proximately caused the alleged losses because there were other intervening factors. In particular, Chicago Title Entities claim that the condition of the buildings, the failure of Founders to obtain anything from the guarantors, and the economic downturn all caused the losses. (Defs.' Memo. in Opp. to Pl.'s Mot. for Summ. J. at 15–19, Dkt. No. 232.)

On the current record, the Court concludes that summary judgment based on the issue of proximate causation is inappropriate. First, it is not clear that the condition of the buildings was unforeseeable such as to break the chain of causation. Assuming *arguendo* that the buildings on the Subject Properties were deteriorated, it is entirely foreseeable that the Subject Properties— whose values were inflated by a fraudulent scheme in which Chicago Title Entities participated—were not in as good a condition as represented, but instead were in a deteriorated condition. Indeed, perhaps the reason the Subject Properties were not worth as much as their stated values was because of their deteriorated condition.[6] Chicago Title Entities have cited no evidence to rebut this possibility. Thus, viewing the facts in the light most favorable to the FDIC and drawing all inferences in its favor, a factfinder could reasonably conclude that some of Founders's losses due to the Subject Properties' deteriorated conditions were a foreseeable result of Chicago Title Entities' alleged conduct. Similarly, Chicago Title Entities' appeal to Founders's inability to collect from the guarantors is also unavailing. That the guarantors of a

---

[6] Relevantly, the appraisal reviews of David J. Lehman assessing the construction projects were not financially feasible when initially proposed. This evidence supports the FDIC's contention that the failures of these projects were related to the alleged misrepresentations of the values and costs associated with the Subject Transactions and not some unforeseeable extraneous forces. (Pl.'s Br. in Opp. of Defs.' Mot. for Summ. J. at 8, Dkt. No. 235 (citing Ex. 18 to Pl.'s Stmt. of Undisputed Mat. Facts, Dkt. Nos. 208-15).)

13

fraudulent transaction will not in fact be able to guarantee the losses of that fraudulent transaction is entirely within the realm of reasonably foreseeable results.

Finally, with respect to Chicago Title Entities' argument that the market collapse caused Founders's losses, the FDIC contends that the foreclosures on these properties occurred before the economic downturn. The FDIC argues that all of the loans had been defaulted on by November 2007. But the data presented in the report of Mark J. Hosfield—Chicago Title Entities' expert—indicates that the Chicago real-estate market started to decline in January 2008. (Pl.'s Br. in Opp. of Defs.' Mot. for Summ. J. at 10, Dkt. No. 235 (citing Ex. 23 to Decl. of Richard McLaren, Jr. at 17–18, Dkt. No. 222-6 at 5).) This raises a genuine factual issue as to whether at least some of the losses that Founders incurred were not attributable to the economic downturn. Moreover, the loss in value between the stated values of the properties and their actual values occurred upon the closings of the Subject Properties. That loss was arguably a completely foreseeable result of Chicago Title Entities' alleged conduct, irrespective of the economic downturn. Ultimately, what impact the economic downturn had on the values of the Subject Property and what part it played in Founders's losses are questions for the factfinder, not ones appropriate for resolution at summary judgment. As there remain genuine issues of material fact regarding the issue of proximate cause, Chicago Title Entities' motion for summary judgment on the FDIC's breach of contract claim is denied.

B.   **Negligence Claim**

The economic loss doctrine generally prohibits recovery in tort for failure to perform contractual obligations. *LaSalle Bank Nat'l Assoc v. Paramont Properties*, 588 F. Supp. 2d 840, 851 (N.D. Ill. 2008) (citing *Prime Leasing, Inc. v. Kendig*, 773 N.E.2d 84, 94 (Ill. App. Ct. 2002)). However, there is an exception to this doctrine for violations of extra-contractual duties,

14

even where the parties' relationship was created by contract. *Id.* (citing *Congregation of the Passion v. Touche Ross & Co.*, 636 N.E.2d 503, 514 (Ill. 1994)). The existence of a legal duty is a question of law to be determined by the Court. *Gen. Elec. Capital, Corp. v. Equifax Servs., Inc.*, 797 F. Supp. 1432, 1438 (N.D. Ill. 1992). In this case, Chicago Title Entities argue that the FDIC is barred from recovery for negligence because its claim is predicated entirely on violations of contractual obligations and Chicago Title Entities had no extra-contractual duties to Founders.

That is incorrect. Illinois law holds that "[a]n escrow agent has a fiduciary duty to the party making the deposit and the party for whose benefit the deposit is made." *Wells Fargo Bank Minn., NA v. Envirobusiness, Inc.*, 22 N.E.3d 125, 135 (Ill. App. Ct. 2014) (citing *Fantino v. Lenders Title & Guaranty Co.*, 707 N.E.2d 756, 759 (Ill. App. Ct. 1999)). Indeed, escrow agents owe "reasonable care in supervising the closing, verifying the identity of the borrower and notifying the parties to the escrow of potential fraud, and disbursing funds appropriately." *Home Loan Ctr., Inc. v. Flanagan*, 2012 WL 1108132, at *5 (N.D. Ill. Apr. 2, 2012). This fiduciary duty—including a duty to exercise reasonable care—does not arise solely from the terms of the contract and therefore it is an extra-contractual duty outside the scope of the economic loss doctrine. *See Lake Cty. Grading Co. of Libertyville v. Great Lakes Agency, Inc.*, 589 N.E.2d 1128, 1132 (Ill. App. Ct. 1992) (stating that economic loss doctrine "does not apply to extracontractual duties such as an attorney's ethical and fiduciary duties").

Chicago Title Entities argue that an escrow agent's obligations under Illinois law are limited to following the escrow instructions and thus they had no extra-contractual duties. But the case law that Chicago Title Entities cite fails to support their positon. For example, *Fantino* states that an escrow agent "owes a fiduciary duty to act only in accordance with the escrow

15

instructions." 707 N.E.2d at 759. True enough, an escrow agent must follow the escrow instructions, but this does not lead to the conclusion that such is the extent of an escrow agent's obligations. Chicago Title Entities also cite *Freedom Mortgage Corp. v. Burnham Mortgage, Inc.*, 720 F. Supp. 2d 978 (N.D. Ill. 2010), where another judge in this District stated in *obiter dictum* that "[a]ny duty owed by [defendants] in their capacity as closing agents must derive from the closing instructions, and not generally from law and industry standards." *Id.* at 992.[7] In support of that proposition, the *Freedom Mortgage* court cites *Bescor, Inc. v. Chicago Title & Trust Co.*, 446 N.E.2d 1209 (Ill. App. Ct. 1983), which recites the familiar lesson that "an escrowee . . . owes a fiduciary duty to act only according to the terms of the escrow instructions." *Id.* at 1213. But just like *Fantino*, *Bescor* does not limit the duties of the escrow agent to following the instructions.[8]

Accordingly, the Court concludes that Chicago Title Entities did have an extra-contractual, fiduciary duty to Founders to exercise reasonable care in managing the disbursement of funds from the escrow trust. As such, the Court denies Chicago Title Entities' motion for summary judgment on the FDIC's negligence claim.

---

[7] In *Freedom Mortgage*, the Court decided on a motion to dismiss that the plaintiff had adequately alleged a violation of the closing instructions and thus the claim would survive; consequently, the Court did not need to determine whether the closing agents owed the plaintiff any other duty. 720 F. Supp. 2d at 991–92.

[8] Chicago Title Entities also cite *In re Ameriquest Mortg. Co. Mortg. Lending Practices Litig.*, 2010 WL 290493, at *5 (N.D. Ill. Jan. 19, 2010), for the proposition that the duty of reasonable skill owed by closing agents, title companies, title underwriters and mortgage brokers is not an extra-contractual duty, but just a "veneer on the alleged contractual duties." *Id.* However, the court in *Ameriquest* made clear that its decision was predicated on the fact that the plaintiff had not alleged that the defendants "undertook a fiduciary duty in conducting the mortgage transactions." *Id.* at *5 n.5. Since that time, *Wells Fargo Bank Minnesota, NA v. Envirobusiness, Inc.*, 22 N.E.3d 125, 135 (Ill. App. Ct. 2014), and *Home Loan Center*, 2012 WL 1108132, at *5, have held that escrow agents do owe extra-contractual duties to their depositors. This Court follows those holdings as indicative of what the Illinois Supreme Court would hold. *Rennert v. Great Dane Ltd. P'ship*, 543 F.3d 914, 917 (7th Cir. 2008) (federal court sitting in diversity must apply Illinois law as Illinois Supreme Court would apply it); *Home Loan Ctr.*, 2012 U.S. Dist. WL 1108132, at *5 (reasoning that, based on Illinois authorities, that the Illinois Supreme Court would impose such duties on escrow agents).

# CONCLUSION

For the foregoing reasons, Plaintiff FDIC's motion for partial summary judgment (Dkt. No. 207) and Defendants Chicago Title Insurance Company and Chicago Title and Trust Company's motion for summary judgment and for judgment on the pleadings (Dkt. No. 218) are denied.

ENTERED:

Dated: December 19, 2016

Andrea R. Wood
United States District Judge